IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00135-PSF-CBS

OLEG KADEMIYA,

      Plaintiff,

v.

HUNTER DOUGLAS WINDOW FASHIONS, INC.,

      Defendant.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      This matter comes before the Court on Defendant's Motion for Summary Judgment filed December 16, 2005 (Dkt. # 33), together with a supporting brief and exhibits labeled Tabs 1 through 10 (Dkt. # 34).  Plaintiff filed his response on January 23, 2006 (Dkt. # 41), together with Exhibits A through Q.  Defendant filed its reply on February 17, 2006 (Dkt. # 45), together with additional exhibits labeled Tabs 11 through 16.

      The Final Pretrial Order was entered on April 14, 2006 (Dkt # 50).  The matter is set for a five-day jury trial commencing August 21, 2006.  The matter is ripe for determination.  The Court has determined that oral argument will not be of material assistance.

## I.    BACKGROUND

      Plaintiff Oleg Kademiya, an individual of Russian national origin, commenced employment with Defendant Hunter Douglas Window Fashions, Inc. ("Hunter Douglas")

on June 10, 2002 in the position of journeyman electrician (Final Pretrial Order (Dkt. # 50) at 2, 5 and 8).  He was terminated from his position with defendant on February 9, 2004 (*id.* at 4, 7 and 8).  He alleges that on May 12, 2004, he filed a charge of discrimination with the EEOC, although no copy has been provided to the Court, and thereafter received a Notice of Right to Sue.  He filed his complaint on January 25, 2005, apparently within 90 days of receiving the Notice of Right to Sue.

Plaintiff's complaint alleges that he was "treated disparately from non-Russian employees" of the defendant during the course of his employment in that he was "scrutinized more closely than non-Russian employees and did not receive the same pay raises as non-Russian employees," and that "derogatory comments were made regarding [his] national origin."  Complaint, ¶¶ 9, 11.  He also alleges that he was treated disparately in connection with his termination in that he was terminated for allegedly violating a safety policy, when non-Russian employees who allegedly violated the same policy or other safety policies had no action taken against them (*id.*, ¶¶ 9, 10). In four claims for relief, plaintiff's complaint asserts that the defendant's actions violated Title VII, 42 U.S.C. § 2000e *et seq.* (First Claim for Relief), 42 U.S.C. § 1981 (Second Claim for Relief), constituted breach of an implied employment contract arising from provisions of an employment manual (Third Claim for Relief) and that the employer is subject to promissory estoppel (Fourth Claim for Relief).

## II.   DEFENDANT'S MOTION AND PLAINTIFF'S RESPONSE

Defendant moves for summary judgment on all four of plaintiff's claims, asserting one set of reasons for dismissal of the federal discrimination claims and another set of reasons for dismissal of the state law claims.

First, defendant argues, plaintiff does not state a claim for violation of 42 U.S.C. § 1981, as his Russian national origin is not a protected race under that statute. Defendant further argues that even if national origin is a prohibited basis for discrimination under 42 U.S.C. § 1981, both of plaintiff's federal discrimination claims should be dismissed because he was terminated for a legitimate nondiscriminatory reason, namely the violation of a company safety policy, and he fails to show that the employer's reason for termination was pretextual (Defendant's Brief at 6-10). Defendant also argues that plaintiff's breach of contract and promissory estoppel claims are subject to summary judgment because he cannot establish a contract or show reliance on any company employment policy (*id.* at 11-14).

Plaintiff asserts that he has stated a claim for "national origin" discrimination, both in connection with his performance reviews and smaller salary increases because another similarly situated non-Russian employee was treated more favorably, and in connection with his termination for safety violations because the employer's stated ground was pretextual as to at least one non-Russian employee who was not fired for a similar or allegedly more serious violation (Plaintiff's Response at 10-13).  He also argues that he has properly alleged a breach of contract claim, apparently based on a company handbook that provided for progressive discipline which was not followed in

his case (*id.* at 13-18).  Finally, he states that his claim for promissory estoppel, also based on the policies in the company handbook, may stand even if his claim for breach of contract does not (*id.* at 19).

## III.    STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether a trial is necessary.  *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).  In other words, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits.  F.R.Civ.P. 56(c).  When applying this standard, a court must view the factual record in the light most favorable to the nonmovant.  *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

## IV.    ANALYSIS

As Defendant's Motion sets forth various grounds as to the separate various claims asserted by plaintiff this Order separately addresses the defendant's arguments.

A.    Whether 42 U.S.C. § 1981 Prohibits Discrimination of the Type
      Alleged

In his Second Claim for Relief plaintiff alleges that he was the victim of

"purposeful and intentional discrimination" on "the basis of his national origin

(Russian)" in connection with his employment in violation of 42 U.S.C. § 1981.

Defendant argues that statute does not apply to national origin discrimination as

opposed to discrimination based on race or ethnicity (Defendant's Reply at 2).

In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987), the Supreme

Court stated that "[a]lthough § 1981 does not itself use the word 'race,' the Court has

construed the section to forbid all 'racial' discrimination in the making of private as well

as public contracts" citing to *Runyon v. McCrary*, 427 U.S. 160 (1976).  Plaintiff in the

*Saint Francis College* case was born in Iraq and described as of "Arabian ancestry,"

and the question presented was whether he was protected against racial discrimination

under U.S.C. § 1981.  481 U.S. at 607.  After surveying various historical definitions of

the word "race," the Supreme Court concluded:

>             Based on the history of § 1981, we have little trouble
> in concluding that Congress intended to protect from dis-
> crimination identifiable classes of persons who are
> subjected to intentional discrimination solely because of
> their ancestry or ethnic characteristics.  Such discrimination
> is racial discrimination that Congress intended § 1981 to
> forbid, whether or not it would be classified as racial in terms
> of modern scientific theory.

*Id.* at 613.  The Court did not further define discrimination based on "ancestry" or

"ethnic characteristics," but it did state "[i]f respondent on remand can prove that he

was subjected to intentional discrimination based on the fact that he was born an Arab,

-5-

rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." *Id.*

Defendant argues that the meaning of the *Saint Francis College* decision is that "the place or nation of one's origin does not, without more, give rise to a Section 1981 claim" (Defendant's Reply at 3) and that the Tenth Circuit has since held that "Section 1981 does not protect individuals from discrimination based on national origin." *Id.* While it is true, as defendant argues, the Tenth Circuit panel in *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 n. 7 (10th Cir. 1991) commented that "actually § 1981 does not outlaw national origin discrimination per se, only discrimination on the basis of race," it went on to state that "[t]he concept of race under § 1981 is broad. It extends to matters of ancestry which are normally associated with nationality, not race in a biological sense" citing to a Fifth Circuit decision noting that "persons of Iranian descent are a protected race under § 1981, although anthropologists classify them as Caucasian." *Id.*

Plaintiff in the instant case has alleged that he was discriminated against because of his "national origin (Russian)," which like Iranian, sounds like a "matter[ ] of ancestry which [is] normally associated with nationality." Although this seems far from the type of racial discrimination which U.S.C. § 1981 may have originally contemplated as described in *Saint Francis College, supra*, this Court is bound to follow the Tenth Circuit precedent and therefore cannot grant defendant's motion for summary judgment on plaintiff's Second Claim for Relief on the basis of this argument.

## B.     Plaintiff's Claims of Discrimination In Conditions of Employment

Although not set forth as a separate claim for relief, plaintiff's complaint alleges that even before he was terminated he was discriminated against in the conditions of employment, in violation of Title VII and § 1981, by being scrutinized more closely than, and by not receiving the same pay raises as, non-Russian employees (Complaint, ¶ 11).  He also claims that derogatory comments were made regarding his national origin.  *Id.*  He claims that as a result of such conduct he "suffered lost compensation, benefits and other perquisites of employment" (Complaint, ¶ 13), and as relief he seeks damages for "lost compensation, benefits and other perquisites of employment" as well as reinstatement (Complaint, Prayer for Relief at 7).  Plaintiff further elaborates in his Response that a non-Russian fellow worker, Mr. Semantel, who worked under the same supervisor as did plaintiff, Mr. Ian Miller, received similar or possibly less favorable performance evaluations from Miller during the same rating period, and yet received a 4% increase in pay, while plaintiff received a 2% increase (Plaintiff's Response at 4).

Defendant's Motion brushes only lightly over these claims, arguing that plaintiff has no evidence of a discriminatory animus to establish a *prima facie* case (Defendant's Brief at 7).  In its reply defendant asserts, despite plaintiff's wage differential contentions summarized above, that "this is a termination case, not a case about alleged disparate pay" and "plaintiff has not alleged a separate pay claim in this case." (Defendant's Reply at 4).

Notwithstanding defendant's perhaps wishful thinking, the Final Pretrial Order, which supercedes the pleadings in the case, claims that plaintiff suffered bias "in a number of ways during [his] employment" and not just regarding termination, including less favorable performance reviews and lower pay raises (Final Pretrial Order at 3) and seeks the same damages as sought in the complaint (*id.* at 5).

As set forth in *Kenderick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000), a plaintiff alleging discrimination on the basis of race, or presumably national origin, "may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." Here plaintiff asserts his supervisor, Mr. Miller, who issued the performance evaluations and recommended the pay increases, allegedly expressed his bias against plaintiff by making subjective comments that plaintiff attempts to characterize as racially derogatory for Title VII and § 1981 purposes.

Specifically, plaintiff testified to one occasion where Mr. Miller allegedly stated that he would have to find a substitute for plaintiff after plaintiff expressed reservations about working with co-employee Patrick Semantel, and Miller allegedly stated that there were too many "Russians" working for defendant (Depo. of Kademiya, Exhibit A to Plaintiff's Response, at 78-81). Plaintiff cites to a second instance where he claims Mr. Miller apparently referred to him as "Saddam Huessein." *Id.* at 62. Plaintiff also cites to an occasion where Mr. Miller allegedly told plaintiff and other individuals of Russian descent to stop speaking Russian apparently while on a break (*id.* at 166).

-8-

Defendant contends that even if Mr. Miller made such comments as attributed to him by plaintiff, they do not support an inference of discrimination as the comments are not necessarily reflective of national origin bias on the part of Miller against the plaintiff, and such stray comments do not have any nexus to the alleged discriminatory employment action (Defendant's Brief at 8).  As the Tenth Circuit stated in the context of a case where the employee alleged religious discrimination in connection with an employer's work assignment decision, "[i]solated remarks, unrelated to the disputed employment action, are insufficient to demonstrate discriminatory animus. . . .  Rather, a plaintiff must demonstrate that there is a nexus between the alleged discriminatory comments, and the disputed employment decision."  *Stover v. Martinez*, 382 F.3d 1064, 1077-78 (10th Cir. 2004) (citations omitted).

Here, the Court agrees that the alleged reference to plaintiff as "Saddam Hussein" although perhaps an offensive insult, does not appear to indicate any kind of bias based on plaintiff's asserted Russian national origin.  The alleged direction to plaintiff and others to not speak Russian does not appear to bear any relationship to any employment decision made by Miller, and as plaintiff himself admitted, the statement did not bother him and may have been made in a joking manner (Kademiya Depo., Exhibit A to Plaintiff's Response, at 166-67).

However, the comment about too many Russians working for defendant arguably could be found by a reasonable jury to indicate some type of national origin bias on the part of Mr. Miller.  Given the fact the alleged remark was apparently made in the context of making employment assignments, and was made directly to and referring to

the plaintiff, it could support an inference of discriminatory animus on the part of Mr. Miller.

Moreover, because Mr. Miller was the supervisor who completed the plaintiff's and Semantel's performance evaluations, and was apparently the first supervisor to approve, or at least recommend, the disparate pay raises between them (*See* Exhibits I and J to Plaintiff's Response–"Employee Status Change Reports" dated May 3, 2003 (Semantel's) and June 7, 2003 (Plaintiff's), respectively; *see also* Depo. of Ian Miller, Exhibit K to Plaintiff's Response, at 10), a reasonable jury might well find a nexus between the alleged remark by Miller and a bias that affected his pay raise recommendations.

Alternatively, even in the absence of direct evidence of a discriminatory animus, a plaintiff can establish a *prima facie* case of employment discrimination either under Title VII or under 42 U.S.C. § 1981 under the framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Kenderick*, *supra*, 220 F.3d at 1225-27 & n. 4 (noting that the analytical framework of *McDonnell Douglas* applies to Title VII claims as well as to claims brought under § 1981); *see also Hysten v. Burlington N. and Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).  Under such framework, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802.  At the summary judgment stage it then becomes the plaintiff's burden to show that there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is "unworthy of belief," thus

Case 1:05-cv-00135-PSF-CBS   Document 56   Filed 07/14/06   USDC Colorado   Page 11 of 24

pretextual. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  If plaintiff

succeeds both in making out a *prima facie* case and in showing that defendant's

proffered reasons may well be pretextual, plaintiff's claim will withstand summary

judgment. *Id.*

Here, however, defendant does not articulate any legitimate, nondiscriminatory

reason for the differences in the pay raises between plaintiff and Mr. Semantel.  Rather,

it simply asserts (incorrectly) that "this is a termination case, not a case about alleged

disparate pay." Accordingly, on this record plaintiff need not come forward with any

evidence of pretext, as there is nothing to challenge.  To the extent plaintiff's First and

Second Claims allege discrimination in the awarding of pay increases, or the issuance

of discriminatory evaluations, the defendant's motion for summary judgment is denied.

## C. Plaintiff's Claims of Discrimination In Connection With His Termination

For purposes of its motion for summary judgment on plaintiff's claim of discrim-

inatory termination in violation of Title VII and Section 1981, defendant concedes that

plaintiff has set forth a *prima facie* case (Defendant's Brief at 7).  Here, however,

defendant asserts that it terminated plaintiff on February 9, 2004 for a legitimate,

nondiscriminatory reason in that on February 6, 2004 he violated a company safety

rule and corresponding OSHA regulation when he removed the protective lock from a

480-volt circuit that had been placed there by a fellow employee, Lisa Kahle, who was

working at the other end of the circuit (*id.* at 1, 4 and 7).  Defendant claims that plaintiff

had been trained about the seriousness of such a violation and knew that severe

-11-

discipline up to and including termination would result from such misconduct. Defendant also contends that the safety violation of February 6, 2004 was not the first time plaintiff had been cautioned about safety issues. Thus, defendant asserts that plaintiff's national origin was no factor in the decision and the termination was in compliance with the company's policies.

Plaintiff does not dispute that the employer asserted in February 2004 that he had violated a safety policy. He also does not dispute that he removed a protective lock on February 6, 2004 that had been placed by his fellow employee, Ms. Kahle, but does assert that such action does not explain the entire situation. According to plaintiff, what occurred on that date while he was working with Ms. Kahle was that he "removed the entire breaker, with the lockout/tagout device still attached and put a plastic cover over the hole in the panel and closed the panel." (Affidavit of Kademiya, Exhibit B to Plaintiff's Response, ¶ 4). Plaintiff asserts that "[a]t that point there was no connection between the electrical panel and the machine, the several sections of conduit had been removed, and all of the wiring had been completely removed prior to removal of the circuit breaker. Further, the electrical panel had been closed so no employee would be accidentally hurt." (*Id.*). As a result of his actions, plaintiff contends "[t]here was no possibility that my co-worker could have been hurt. Additionally, he claims that once all wiring had been removed, the lockout/tagout policy did not apply." (*Id.*). Based on this version, plaintiff concludes that he "did not violate company safety regulations." (*Id.*). Therefore he argues, the defendant's basis for termination is a pretext for national origin discrimination.

-12-

Notwithstanding plaintiff's explanation of his version of the event, and his insistence that the steps he took did not endanger the fellow employee, it appears that he did violate both an OSHA regulation and a company safety policy.  Defendant correctly asserts that the pertinent OSHA regulation provides as follows:

> When a tag is attached to an energy isolating means, it is not to be removed without authorization of the authorized person responsible for it, and it is never to be bypassed, ignored, or otherwise defeated.

29 C.F.R. 1910.147(c)(7)(ii)(B) (Defendant's Brief at 5, 6 and n.4).  Plaintiff makes no response to this assertion, and while the Court may not be entirely conversant with the OSHA safety regulation, plaintiff does not contend that he consulted with Ms. Kahle or any authorized person before removing the lockout tag, and he gives no explanation for his apparent violation of the language that prohibits bypassing a lockout tag.

Moreover, plaintiff admits the defendant had a written safety policy relating to control of hazardous energy by lockout/tagout safety procedures, and indeed he attached a copy of a portion of the policy as Exhibit O to his Response.  Plaintiff, selectively quoting from the partial excerpt of the policy, appears to suggest in his response that the lockout/tagout procedure only applies when the accidental operation of electrical machinery "could cause injury to personnel or equipment" citing to section 6.1 of the policy (Plaintiff's Response at 6-7).  Given that the Court was only presented with a portion of the policy, it cannot find that the policy is necessarily as limited as plaintiff suggests.

Nor can the Court agree that plaintiff's view of the situation on February 6, 2004, that he did not violate the policy because in his opinion there was no possibility that Ms. Kahle could have been hurt, and because once all wiring had been removed the lockout/tagout policy did not apply, overrides the employer's determination that the purpose of the policy is "to ensure that machinery or equipment is completely isolated from all sources of potentially hazardous energy before any maintenance or service is performed where the unexpected energizing or movement of machinery or equipment could cause injury."  Exhibit O to Plaintiff's Response at 2.

In any event, in a case such as this where the employer has come forward with a legitimate, nondiscriminatory policy upon which its termination decision was based, the employee's denial of the factual basis for the enforcement of the employer policy does not alone establish pretext, particularly where, as here, the employer conducted an investigation and concluded that the policy was violated.  An articulated motivating reason for a termination is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.  Rather, the test is good faith belief on the part of the employer at the time of termination.  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (finding that plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence to the district court that the allegations may have been false);  *EEOC v. Flasher Co., Inc.,* 986

F.2d 1312, 1322 n.12 (10th Cir.1992) ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.").

The evidence in the record does not demonstrate that the defendant acted other than in good faith in terminating plaintiff on the basis of a belief that he violated a company safety policy. The termination notice states unambiguously that the reason for termination was "violation of company safety policy." Exhibit L to Plaintiff's Response. Plaintiff makes no showing that the documentation of plaintiff's termination reflects any other grounds for the termination. *Cf. Equal Employment Opportunity Commission v. BCI Coca-Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 490-92 (10th Cir. 2006), where the court found that inconsistent explanations advanced for the plaintiff's termination could indicate pretext.

The termination notice is signed by Brad Fitzke, the defendant's Process Maintenance Manager. *See* Exhibit L to Plaintiff's Response. Although Fitzke was first notified of the apparent lockout violation by Mr. Miller, plaintiff's supervisor, and although plaintiff apparently recognized, at least initially, that he had made a mistake, Fitzke did not rely solely on the report of Mr. Miller, or the statement of plaintiff, but rather conducted his own investigation (Fitzke Depo., Exhibit 8 to Defendant's Brief, at 14-15). After speaking with plaintiff, and getting the company safety manger involved, Fitzke undertook to interview Ms. Kahle and another involved individual who found Ms. Kahle's lockout laying on the floor (*id.* at 18-19, 21). After consulting with the safety manager, Fitzke concluded that "a blatant violation of a safety policy had occurred" that "put somebody in harm's way" and therefore recommended termination

-15-

of plaintiff (*id.* at 23).  In explanation of his conclusion, Fitzke testified that notwith-

standing plaintiff's removal of the circuit breaker with Kahle's lock on it, there was

still danger to the employee because the circuit breaker panel "was still hot" and that

wires in the conduit could have shorted out and exposed her to 480 volts of electricity

(*id.* at 23).

Plaintiff does not argue, or even suggest, that Mr. Fitzke ever expressed any kind

of discriminatory animus towards plaintiff based on his race, ethnicity or national origin.

The only probative evidence of national origin bias is the one statement discussed

above attributed to Mr. Miller.  The Tenth Circuit has held that "under certain

circumstances, a defendant may be held liable for a subordinate employee's prejudice

even if the manager lacked discriminatory intent."  *English v. Colorado Dept. of

Corrections*, 248 F.3d 1002, 1011 (10th Cir. 2001).  However, those circumstances

are not present here.

Although Miller may have made the initial report to Fitzke, he apparently had no

involvement in the follow-up investigation or the decision to terminate plaintiff, or at least

plaintiff has shown no such involvement.  Thus Miller's arguable bias can not be

attributed to Fitzke or to the company under these circumstances.  As the Tenth Circuit

stated recently in *EEOC v. BCI Coca-Cola Bottling, supra*, in explaining the so-called

"cat's paw" or "rubber stamp" theory of discrimination, "[t]wice we have held that a

plaintiff could not prevail because the decisionmaker had conducted an independent

investigation of the facts, rather than relying entirely on the recommendation of the

biased subordinate."  450 F.3d at 485.  Here, too, the evidence shows that the

-16-

decisionmaker conducted such an independent investigation, including obtaining

plaintiff's version of the events.  Thus, plaintiff has failed to show that Fitzke's

termination recommendation was made other than in good faith, or with a discriminatory

motive.

In *EEOC v. BCI Coca-Cola Bottling, supra,* the Tenth Circuit also emphasized

that:

> A plaintiff also may show pretext by providing evidence that
> he was treated differently from other similarly situated,
> nonprotected employees who violated work rules of
> comparable seriousness, provided the similarly situated
> employee shares the same supervisor, is subject to the
> same performance standards, and otherwise faces
> comparable relevant employment circumstances. *Green v.
> New Mexico*, 420 F.3d 1189, 1194 (10th Cir.2005) (quoting
> *Kendrick, supra,* 220 F.3d at 1232).

450 F.3d at 489 (internal quotation marks omitted).

Here, plaintiff also contends that the employer's termination decision was

pretextual because Ms. Kahle's conduct on the date in question also allegedly violated

the same safety policy as plaintiff was charged with violating, but she was not

terminated, and Mr. Semantel purportedly violated safety policies on other occasions,

but was not terminated (Plaintiff's Response at 7-8; 11-13).

Defendant, however, correctly shows that the record does not support plaintiff's

contention that Ms. Kahle's conduct violated the lockout/tagout policy.  Plaintiff contends

that Ms. Kahle violated the policy by failing to install a "multiple locking device" in

violation of the lockout/tagout policy (Plaintiff's Response at 7).  Plaintiff argues that

such violation should have resulted in Ms. Kahle's termination (*id.* at 12).  However,

noticeably absent from Plaintiff's Response is any citation to the record that supports his argument that failing to install a multiple locking device is mandatory.

In questioning Ms. Kahle at her deposition, plaintiff's counsel sought to elicit an admission that installing a multiple locking device was mandatory (*see* Depo. of Kahle, Exhibit P to Plaintiff Response, at 22), but Ms. Kahle twice responded that she was required to put on her "personal lock" and did not agree that a multiple locking device was mandatory (*id.*). Similarly, plaintiff's counsel attempted to have Mr. Fitzke testify that a multiple locking device was mandatory, but he also testified that such "multiple lock device" was not mandatory (*see* Depo. of Fitzke, Tab 13 to Defendant's Reply, at 31 and 33). Finally, plaintiff identifies no provision in the company's lockout/tagout policy (Exhibit O to Plaintiff's Response) that requires the multiple locking device urged by plaintiff. Thus, there is no basis for finding that Ms. Kahle committed any safety offense, much less one that was of comparable seriousness.

Plaintiff contends that Mr. Semantel had violated company safety rules on three occasions but unlike plaintiff was not terminated, thereby indicating pretext in the reasons given for plaintiff's termination. According to plaintiff, Mr Semantel had three "near misses, one of which caused sparks from an energization, the very policy the lockout/tagout procedure is intended to prevent." (Plaintiff's Response at 11).

As noted above, when a plaintiff seeks to show pretext in an employment decision by showing differential treatment from similarly situated employees, he must show that he was "treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness." *EEOC v. BCI Coca-*

*Cola Bottling, supra,* 450 F.3d at 489.  Here, the defendant has made a sufficient showing that the alleged violations attributed by plaintiff to Mr. Semantel were not of "comparable seriousness" to plaintiff's violation of the lockout/tagout policy, and thus comparable discipline was not mandated (*see* Fitzke Depo., Tab 8 to Defendant's Brief, at 38-40; Miller Depo., Tab 4 to Defendant's Brief, at 13).  Plaintiff has made no showing to rebut these determinations by defendant that Semantel's violations were not of comparable seriousness, and thus plaintiff does not show pretext through such comparison.

Finally, plaintiff suggests that even if plaintiff did violate the company's lockout/tagout policy, termination was not required under that policy, citing to the language from Exhibit O which states:

> ANY EMPLOYEE WHO REMOVES A LOCKOUT OR
> TAGOUT FROM ANY PIECE OF EQUIPMENT OTHER
> THAN THEIR OWN WITHOUT PROPER AUTHORIZA-
> TION, OR WHO OPERATES ANY PIECE OF EQUIPMENT
> THAT IS LOCKED OUT / TAGGED OUT WILL BE
> SUBJECT TO DISCIPLINARY ACTIONS UP TO AND
> INCLUDING TERMINATION.

(Exhibit O to Plaintiff's Response at 4; boldface omitted).  It is true that the policy allows for discipline short of  termination, but it also expressly provides for possible termination. As stated in *Kendrick, supra*:  "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct. 'Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.'"  220 F.3d at 1233 (citation omitted).

Accordingly, plaintiff has failed to demonstrate that defendant's stated reason for his termination was pretextual, and therefore defendant's motion for summary judgment is GRANTED as to the First and Second Claims for Relief to the extent they allege violations of Title VII and 42 U.S.C. § 1981 arising from plaintiff's termination by defendant on February 9, 2004.

### D.    Plaintiff's Claim of Breach of Contract

Plaintiff's Third Claim for Relief purports to state a claim for breach of contract but nowhere identifies the alleged contract nor specifies the alleged terms of the contract that were allegedly breached.  Complaint, at ¶¶ 27-28.  Plaintiff's deposition testimony does not shed much light on what contract provisions he claimed had been breached, but he did seem to indicate that he felt the employee handbook contained policies that were not followed (Depo. of Kademiya, Tab 3 to Defendant's Brief, at 155-58).

Defendant, in moving to dismiss the Third Claim for Relief assumes that plaintiff is alleging breach of the progressive discipline provisions contained in its employee handbook, excerpts of which are attached under Tab 4 to Defendant's Motion, marked as Deposition Exhibit 17.[1]  See Defendant's Brief at 13.

Plaintiff's Response is as equally unilluminating as the complaint, for it contains primarily a lengthy generic discussion of Colorado law pertaining to employment-at-will without any substantive discussion of the law as it applies to plaintiff's Third Claim for

---

[1]   Deposition Exhibit 17, which appears to be the defendant's "Corrective Action/ Progressive Discipline" policy dated February 1, 1997, also appears in a slightly different version as Exhibit M to Plaintiff's Response. The Court has compared the two versions, and while the wording is not identical, the substance of the pertinent provisions appears to be the same.

Relief (Plaintiff's Response at 13-18).  The only sentence that appears to elucidate plaintiff's claim is the statement that plaintiff had the understanding that he was subject to "a progressive disciplinary scheme." (*Id.* at 18).  For purposes of this motion, the Court will assume that plaintiff is alleging that the progressive discipline language in Deposition Exhibit 17 constitutes a contract.

As defendant points out, the plaintiff signed an acknowledgment upon receiving the handbook which expressly states in capital letters that it is "not intended to constitute a contract of employment, either express or implied, nor are they a guarantee of employment for a specific duration." (Deposition Exhibit 16, attached under Tab 4 to Defendant's Brief). Under Colorado law, when an employee handbook clearly and conspicuously disclaims any intent to enter into a contract the employer retains the right to discharge employees at will.  *See e.g. Ferrera v. Nielsen*, 799 P.2d 458, 461 (Colo. App. 1990) ("Summary judgment denying claims based on a handbook is appropriate if the employer has clearly and conspicuously disclaimed intent to enter a contract limiting the right to discharge employees.").  Plaintiff has offered no argument as to why this principle of law should not be applied here.

Moreover, even if the "Corrective Action/Progressive Discipline" policy were found to be an implied contract, it contains an express provision which allows the supervisor to move directly to any appropriate step in the progressive discipline procedure with the approval of the appropriate division managers and the Human Resources Department (Deposition Exhibit 17, Tab 4 to Defendant's Brief, at 1). Defendant argues, and the evidence of record appears to show, that this is what

-21-

occurred in connection with plaintiff's termination.  Plaintiff has offered no argument to the contrary.  Furthermore, as set forth above, the defendant's lockout/tagout policy expressly provides for disciplinary action "up to and including termination" in the event of a violation.

On the basis of this record, the Court cannot find that there is a genuine dispute of material facts as to plaintiff's breach of contract claim, as there an insufficient showing of the existence or the alleged contract, as well as of any breach of the alleged contract. Defendant's motion for summary judgment as to the Third Claim for Relief is granted.

### E.    Plaintiff's Claim of Promissory Estoppel

Plaintiff's Fourth Claim for Relief asserts a claim based on promissory estoppel, alleging that defendant "represented to Plaintiff that certain policies, practices and/or procedures regarding his employment with Defendant would be followed," that plaintiff justifiably relied on such representations, and defendant failed to abide by its policies practices and procedures causing harm to plaintiff.  Complaint, ¶¶ 30-31.

As with his Third Claim for Relief, plaintiff fails to specify what policies, practices and/or procedures were represented, or how they were allegedly not followed.  In his Response, plaintiff clarifies that the representations are those made in the handbook and asserts they were relied upon by him in continuing his employment (Plaintiff's Response at 19).

Plaintiff is correct that under Colorado law an employee may state a claim for promissory estoppel even if the requisites for the formation of a contract are not met,

citing to *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987).  However, as plaintiff correctly quotes, the *Keenan* decision holds that in order to establish such a claim, the employee must demonstrate "that the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures, that the employee reasonably relied on the termination procedures to his detriment, and that injustice can be avoided only by enforcement of the termination procedures."  *Id.* at 712.

Although plaintiff asserts these elements in his complaint, he fails to come forward with any evidence that the employer here should have reasonably expected the employee to consider the manual as a commitment to follow the termination procedures.  As noted above, the defendant employer plainly disclaimed that the progressive discipline procedures constituted a contract, included a provision that allowed the supervisor to move directly to the termination step, and expressly advised all employees that violation of the lockout/tagout policy could result in immediate termination.

When the principal argument against a claim of promissory estoppel based on a progressive discipline policy is reliance on a disclaimer, the plaintiff has the burden of demonstrating a material issue of fact exist as to the employer's reasonable expectations in order to negate resolution of the issue on summary judgment.  *See e.g. Stewart v. Whitmire Distr. Corp.*, 1995 WL 243434 **3 (Table, 53 F.3d 343) (10th Cir. 1995).  Plaintiff here offers no evidence in the record by pointing to depositions, documents or other discovery materials, that the employer actually or should have

-23-

perceived that the discipline procedures constituted a commitment given such language. Thus, to paraphrase *Stewart, supra*, this Court has found nothing in the record indicating plaintiff can satisfy the *Continental Air Lines* test by showing defendant should reasonably have expected its employees, and Mr. Kademiya in particular, to consider defendant bound to follow progressive termination procedures in this instance. *Id*. For these reasons, defendant is entitled to summary judgment on plaintiff's Fourth Claim for Relief.

**CONCLUSION**

Defendant's Motion for Summary Judgment (Dkt. # 33) is GRANTED in part and DENIED in part.

The motion is GRANTED as to the First and Second Claims for Relief to the extent they allege violations of Title VII or Section 1981 based on plaintiff's termination on February 9, 2004, and as to the Third and Fourth Claims for Relief.

The motion is DENIED as to the First and Second Claims for Relief to the extent they allege violations of Title VII or Section 1981 based on plaintiff's evaluations and alleged pay disparities with a similarly situated employee not subject to alleged discrimination.

DATED: July 13, 2006

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge